UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ARLYS WILLIAMS,

                Plaintiff,                           No. 12-cv-11775
                                                      HON. MARK A. GOLDSMITH

vs.

TARGET CORPORATION, et al.,

                Defendants.
_____/


## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT (DKT. 21) and DENYING PLAINTIFF'S MOTION FOR JUDGMENT (DKT. 22)

### I.      INTRODUCTION

This case is brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq. Plaintiff Arlys Williams brings this challenge under § 1132(a)(1)(B), contesting Defendants' termination of Plaintiff's disability benefits. The complaint seeks a judgment for past due disability benefits and an order to pay future disability benefits. Am. Compl. at 5 (Dkt. 8). Both parties moved for judgment, in accordance with the procedure outlined in Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 619 (6th Cir. 1998), for adjudicating an ERISA action. The cross-motions for judgment are fully briefed, and the parties have also filed supplemental briefs. For the reasons that follow, the Court concludes that the ERISA Plan and Policy documents contain valid grants of discretionary authority, and that the party making the benefits decision, Defendant Hartford Life and Accident Insurance Company, was properly delegated that authority. Therefore, under Supreme Court and Sixth

Circuit precedent, Hartford's decision is entitled to deferential review.  Applying the "arbitrary and capricious" standard of review, the Court concludes that Hartford's decision was rational in light of the Plan provisions and the record evidence.  The Court, therefore, grants Defendants' motion for judgment (Dkt. 21) and denies Plaintiff's motion for judgment (Dkt. 21).

## II.      BACKGROUND[1]

Plaintiff Arlys Williams was employed by Defendant Target Corporation, f/k/a Dayton-Hudson.  A.R. 656.  In 1997, Plaintiff was diagnosed with fibromyalgia and chronic fatigue syndrome.  A.R. 657.  On April 7, 1998, Dayton-Hudson approved Plaintiff for long-term disability (LTD) benefits under the Dayton Hudson Executive Long Term Disability Plan.  A.R. 591.  Dayton Hudson later changed its name to Target Corporation.  In 2005, Target began relying on an umbrella employee welfare benefit plan document, and it issued a summary plan description (SPD) for an LTD Plan effective April 1, 2006.  Stepan Aff. ¶ 4 (Dkt. 32-3).  Between 1998-2010, the Plan was self-insured by Target, and the claims administrator was Principal Mutual Life Insurance Company.  A.R. 704; A.R. 717; A.R. 723.  In 2010, Defendant Hartford Life and Accident Insurance Company became the claims administrator.  A.R. 693.  Although the Plan was initially self-insured, Hartford subsequently issued a policy to Target (the Policy) that insures the LTD Plan.  The effective date of the Policy was January 1, 2010.  A.R. 679.  The Policy states that it was incorporated into, and forms a part of, the Plan.  A.R. 679.

In 2009 or 2010, Plaintiff moved from Minnesota to Michigan.  A.R. 391; A.R. 68-69.  On August 8, 2011, Plaintiff's benefits were terminated by Hartford.  A.R. 008.  After Hartford denied Plaintiff's appeal, Plaintiff commenced this lawsuit.  Plaintiff's amended complaint (Dkt.

---

[1] This section provides an overview of the history of the claim at issue.  The doctor reports, functional assessments, and other medical evidence in the administrative record are discussed later in this Opinion, in the analysis of whether the denial of benefits decision should be upheld.

8) seeks (i) a declaration that Plaintiff is entitled to benefits and (ii) an order and judgment awarding Plaintiff benefits.

### III.    STANDARD OF REVIEW

The Supreme Court has explained that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a <u>de novo</u> standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). "[A]pplication of the highly deferential arbitrary and capricious standard of review is appropriate only when the plan grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan." <u>Yeager v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376, 380 (6th Cir. 1996).

Plaintiff argues that the Court must apply the <u>de novo</u> standard of review in this case, for two independent reasons: (i) there is no sufficient grant of discretion in the 1998 Plan, and any grant of discretion in the 2010 Policy or in letters summarizing changes in the Policy are barred by the Michigan anti-discretionary clause regulation, Mich. Admin. Code. R. 500.2202; and (ii) Hartford is not an authorized claims decision-maker under the terms of the Plan. Defendant contends that the Policy contained a grant of discretion sufficient to warrant deferential review, and that the grant of discretion was not barred by the Michigan regulation. Defendant further argues that Hartford was properly designated a claims administrator vested with discretionary authority.

Central to determining the applicable standard of review is a resolution of the parties' dispute regarding which Plan documents govern the instant claim: the 1998 SPD, which was in effect when Plaintiff was first awarded benefits; or the later, amended 2005 Plan and the 2010

Policy.  Defendant argues that the terms of the later documents govern, while Plaintiff maintains that the 1998 Plan terms control.

For the reasons set forth below, the Court concludes that the terms of the 2010 Policy are applicable to Plaintiff's claim.  While the 1998 Plan provided that no subsequent amendment would affect the benefits of an established claim, Plaintiff has not demonstrated that any of the 2005 or 2010 amended Plan terms – including the grants of discretionary authority and the appointment of Hartford as claims administrator – affected her benefits.  Because Plaintiff has not shown that the amended terms of the 2005 Plan and 2010 Policy affected her substantive entitlement to benefits, the terms of the amended Plan and the Policy are applicable to Plaintiff's claim.

Next, the Court concludes that the Michigan anti-discretionary clause regulation does not bar the grant of discretionary authority in the 2010 Policy, because that Policy was not issued or delivered in Michigan.  Furthermore, Plaintiff has not shown that the Policy Certificate was sent to her in Michigan, nor is there any evidence that the 2009 and 2010 letters were sent to Plaintiff in Michigan.  As a result, the Court cannot say that the Michigan regulation was triggered by those documents either.  Finally, the Court concludes that the 2010 Policy properly designated Hartford with discretionary authority to make benefits determinations, according to delegation procedures laid out in the 2005 Plan.  For these reasons, the Court determines that it must apply the deferential "arbitrary and capricious" standard of review to the denial of Plaintiff's benefits.

## A.  The Governing ERISA Documents

The threshold issue facing the Court is which of the various Plan documents contained in the administrative record are applicable to Plaintiff's claim.  Plaintiff contends that the 1998 SPD is the governing document; Defendants argue that the 2010 Policy is controlling.  The Court

4

notes that the 1998 Plan, by its terms, reserves the right to amend or terminate the Plan at any time, although it further provides that no amendment or modification would affect benefits of an established claim. The Court concludes, based on this language, that any amendment to the 1998 Plan would be applicable to Plaintiff's claim, unless such amendment would affect Plaintiff's substantive entitlement to benefits.   The Court further determines that Plaintiff has not demonstrated that any amendment in the 2005 Plan or 2010 Policy would affect her substantive entitlement to benefits; the provisions regarding eligibility for disability are the same in each of the three plans, and each of the three plans contains a grant of discretionary authority sufficient to warrant deferential review.   Furthermore, Plaintiff has not shown that the appointment of Hartford as a third-party decision-maker affected her benefits.   Therefore, the terms of the most recent amended Plan document – the 2010 Policy – are controlling.

### 1.  Plan Provisions

The Court first turns to the relevant provisions of the various Plan documents.   There are several different documents in the administrative record relating to the ERISA Plan governing Plaintiff's claim: the 1998 SPD; the 2005 umbrella welfare benefit plan; the 2006 amended SPD; the 2010 Insurance Policy; the 2010 Insurance Policy Certificate; and the form letters from 2009 and 2010 summarizing changes made by the 2010 Policy.[2]   The relevant provisions from each of

---

[2] Although the original administrative record did not contain all of these documents, the Court ordered supplementation of the record to acquire a full picture of the Plan documents relating to Plaintiff's claim, and to comply with CIGNA Corp. v. Amara, 131 S. Ct. 1866, 1878 (2011). Under Amara, summary plan documents do not establish the terms of an ERISA plan.  But see Liss v. Fidelity Employer Servs. Co., 516 F. App'x 468, 474 (6th Cir. 2013) (analyzing Amara, and concluding that an "SPD can be a document or instrument governing the plan without constituting the terms of that plan"). The original administrative record contained the summary plan document (SPD) for the 1998 LTD Plan, the SPD for the amended 2005 LTD Plan, and the Policy Certificate for the 2010 Policy; these were the only documents submitted pertaining to those versions of the Plan.  Because the SPDs included in the original administrative record did not, under Amara, establish the terms of the Plan, the Court ordered Defendants to supplement

the administrative record with the relevant portions of the LTD Plan that was in effect when Plaintiff was granted disability benefits in 1998; the relevant portions of the LTD Plan that became effective in 2005; and the relevant portions of the LTD Reserve Buy-out Policy that became effective in 2010.  Order (Dkt. 29).

Defendants submitted several supplemental Plan documents.  However, there were no additional documents submitted regarding the 1998 Plan.  Instead, Defendants submitted an affidavit of Leigh Stepan, the Target Corporation Group Manager of Benefits.  Ex. B. to Def. Memo (Dkt. 32-3).  Having searched Target's business records and files for Plan documentation, Stepan concludes, "Upon information and belief, prior to 2005, Target relied solely on a Summary Plan Description ('SPD') as the sole governing ERISA plan document for its LTD Plan."  Stepan Aff. ¶ 3.

The Court notes that the terms of the 1998 Plan SPD contemplate the existence of a separate Plan document.  See A.R. 704 ("This booklet is only a simplified explanation of the principal features of the Plan; your benefit rights are governed solely by the separate Plan document.").  However, the Stepan affidavit indicates that the SPD was the only Plan document relied upon by Target at the time, and the parties agree that the Court should refer to the SPD for the terms of the Plan that was in effect in 1998.  Def. Memo at 2-3 (Dkt. 32); Pl. Memo at 1-2 (Dkt. 33).  The Court has, therefore, referred to the 1998 SPD for the terms of the Plan in effect when Plaintiff was initially awarded benefits.

The supplementation also contains an umbrella employee welfare plan that became effective February 1, 2005.  A.R. 746.  The umbrella plan document incorporates by reference the SPDs related to medical benefit programs covered by the Plan.  A.R. 752; A.R. 761.  Although Plaintiff argues that "there is no plan that became effective in 2006," Pl. Memo at 3 (Dkt. 33), the Court concludes that the administrative record clearly establishes that there existed a 2005 amendment to the LTD Plan, for which Target produced an SPD effective 2006.  The Court has referred to the umbrella Plan document as well as the Plan SPD that became effective in 2006 for the terms of the amended Plan.

Finally, the supplementation includes the insurance policy, which provides that the Policy contract includes any certificates incorporated and made a part of the Policy.  A.R. 741.  Defendants argue that because the Policy Certificate submitted as part of the original administrative record was incorporated as part of the Policy, the certificate's terms govern.  Def. Memo at 2 (Dkt. 32).   Plaintiff does not respond to this argument.

The 2010 Policy Certificate states, "The Policy is incorporated into, and forms a part of, the Plan.  The Plan has designated and named the [Hartford] Insurance Company as the claims fiduciary for benefits provided under the Policy."  A.R. 693.   Therefore, the Court has referred to the provisions in the Policy Certificate as well as in the Policy itself to establish the terms of the 2010 Policy.  [Footnote cont'd on next page.]

these documents include grants of discretion, delegation of claims administration authority, and the ability to amend the Plan.

The Court concludes that the 1998 Plan, the 2005 Plan, and the 2010 Policy each contain a clear grant of discretion to interpret the terms of the Plan. The 1998 Plan provides, "In carrying out its Plan responsibilities, the Company shall have the discretionary authority to interpret the terms of the Plan." A.R. 718. The 2005 Plan provides:

> In carrying out its Plan responsibilities, the Company shall have full discretionary authority to make any and all factual determinations necessary to determine eligibility for benefits or the amount of any benefits and full discretionary authority to construe the terms of the Plan (including the terms of any documents which are incorporated by reference in the Plan).

A.R. 753. The 2010 Policy provides, "The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." A.R. 693.

Regarding claims administration authority, in the 1998 Plan the claims administrator was a third party, Principal Mutual Life Insurance Company, A.R. 704, although the 1998 Plan contains no term expressly providing for procedures to delegate authority to another entity. Under the 1998 Plan, if Principal denies or terminates benefits, the claimant may appeal the decision, first to Principal and then to Dayton-Hudson, the Plan administrator. A.R. 717. Dayton-Hudson would render the final decision on appeal. A.R. 717.

The 2005 Plan provides, "A Named Fiduciary by written instrument may designate a

---

The Court further notes that a group insurance policy may serve to establish the terms of an ERISA benefit plan. Hogan v. Life Ins. Co. of N. Am., No. 12-5902, 2013 WL 1316542, at *5 (Table) (6th Cir. Apr. 3, 2013) ("This circuit has treated group insurance policies as benefits plans . . . ."). Therefore, because the Policy is incorporated into the Plan, the Policy provisions, to the extent they are different from the Plan provisions, constitute amendments to the Plan terms – regardless of the fact that such provisions were set forth in a separate document relating to the insurance policy.

person or persons other than such Named Fiduciary to carry out any or all of the fiduciary responsibilities under the Plan of such Named Fiduciary." A.R. 754. In 2005, Principal remained the claims administrator. The 2010 Policy provides, "The Plan has granted the [Hartford] Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy." A.R. 693.[3]

> Regarding amendment, the 1998 Plan provides:
>
> The Company expects to continue this Plan indefinitely, but reserves the right to amend, discontinue, or terminate the Plan at any time either by action of its Board of Directors or by one or more officers of the Company. Any change or cancellation would not effect [sic] benefits of an established claim . . . . .

A.R. 704.

The administrative record also contains unaddressed form letters from 2009 and 2010. A letter from Target in 2009 states that beginning April 1, 2009, Hartford will begin administering all existing Long-Term Disability claims. A.R. 735. It further states, "This is a change in the administration of benefits only. Your Long-Term Disability Plan benefit provisions that were in effect when you became disabled are not changing." A 2010 letter from Hartford states that effective January 1, 2010, the Plan is funded by Hartford. A.R. 736. It states, "This change in funding will not change the plan of benefits applicable to your claim and The Hartford will remain as claim administrator." A.R. 736.

---

[3] Plaintiff argues that the umbrella welfare benefit plan was amended in 2011 to grant discretionary authority to Target's Vice President, not to Hartford. Pl. Memo at 3 (Dkt. 33). However, Plaintiff misreads the Plan terms at issue. The Plan provision to which Plaintiff points states, "[T]he Vice President, Pay & Benefits shall have full discretionary authority to: . . . Make any and all factual determinations necessary to determine eligibility for benefits or the amount of any benefits and full discretionary authority to construe the terms of the Plan. . . ." A.R. 766. However, the provision goes on to read, "Any third-party administrator, if appointed by a Named Fiduciary, shall have the responsibility for the administration of the Plan to the extent delegated by the Named Fiduciary." A.R. 766. This section of the 2005 Plan contemplates that a third-party may be delegated fiduciary authority, and it therefore does not override the delegation of authority to Hartford in the 2010 Policy.

## 2.  Parties' Arguments

In light of the Plan provisions, the Court turns to the parties' arguments regarding which Plan documents are applicable to Plaintiff's claim.

Defendants argue that the 2010 Policy governs Plaintiff's claim, because the Plan document in effect when Plaintiff was awarded benefits – the 1998 SPD – does not provide that Plaintiff's benefits were vested and therefore unalterable.  Def. Supp. Br. at 1 (Dkt. 38). Defendants argue that the 1998 and 2006 Plan documents expressly allowed for amendment and termination of the Plan at any time.  Id.  Defendants contend that although the 1998 Plan provides that "[a]ny change or cancellation would not effect [sic] benefits of an established claim," there is no Plan provision that expressly vested Plaintiffs benefits.  Id. at 2-3.  Defendants rely on Price v. Bd. of Tees of the Ind. Laborer's Pension Fund (Price II), 707 F.3d 647 (6th Cir. 2013) for the proposition that "terms of a later amended plan apply to an existing claim for benefits that are not vested, such as Plaintiff's claim for benefits here;" Defendants, therefore, argue that the Court should apply the later, amended Plan documents.  Id. at 3-4.

Plaintiff argues that the provision in the 1998 Plan that "[a]ny change or cancellation would not effect benefits of an established claim" unambiguously bars any subsequent amendment that affects Plaintiff's established claim.  Pl. Supp. Br. at 1-2 (Dkt. 40).  Plaintiff argues that this provision vested her right to "non-discretionary decision-making."  Id. at 3.  She further argues that the amendments granting discretionary authority to Hartford affect her established claim.  Id. at 4.  She contends that the 1998 Plan "did not grant Hartford discretion to interpret the plan. . . . Clearly, the subsequent switch to discretionary authority to decide claims would and does 'effect' [sic] plaintiff's established claim."  Id. at 4.  Plaintiff argues the terms of the 1998 Plan should be applied.

### 3.   Whether the Amended Plans are Applicable to Plaintiff's Claim

For the reasons discussed below, the Court concludes that any amendment to the 1998 Plan may not be applied to Plaintiff's claim if the amendment would affect Plaintiff's substantive entitlement to benefits.  The Court further concludes, however, that Plaintiff has not shown that any of the amended Plan terms affect her benefits.  The Plan terms regarding eligibility for disability and termination of disability benefits are the same in each iteration of the Plan, and the 1998 Plan, like the 2005 Plan and the 2010 Policy, contains a grant of discretion sufficient to warrant deferential review.   Furthermore, although the later Plans contained amendments providing for delegation procedures and designating Hartford as claims administrator, Plaintiff has not shown that such amendments affected her benefits.  Under Sixth Circuit law, Plaintiff has the burden of showing that her benefits were vested and not subject to amendment, and she has not met that burden. The Court will, therefore, apply the later, amended Plan terms.

### a.   Limitations on the Right to Amend the Plan

Whether the amended Plan terms may be applied to Plaintiff's claim depends on whether, and to what extent, Plaintiff's benefits were vested under the terms of the 1998 Plan.  The LTD plan at issue in this case is a welfare benefit plan.  See Price II, 707 F.3d at 651 (noting that disability benefits are welfare benefits).  "[U]nless an employer contractually cedes its freedom, it is generally free under ERISA, for any reason at any time, to adopt, modify, or terminate its welfare plan." Inter-Modal Rail Empl. Ass'n v. Atchison, Topeka & Santa Fe Railway Co., 520 U.S. 510, 515 (1997).  This broad freedom to amend welfare plans exists because there is no vesting requirement for ERISA welfare benefits.  Price II, 707 F.3d at 651.  A vested right is defined as "a right that so completely and definitely belongs to a person that it cannot be impaired or taken away without the person's consent." Halback v. Great-West Life & Annuity

10

Ins. Co., 561 F.3d 872, 877 (8th Cir. 2009).  Because there is no vesting requirement for welfare

benefits, "a welfare benefit may be terminated at any time so long as the termination is consistent

with the terms of the plan." Price II, 707 F.3d at 651.

Consistent with this rule, a welfare benefit plan may provide for vesting.  However, "an

employer's commitment to vest such benefits is not to be inferred lightly; the intent to vest must

be found in the plan documents and must be stated in clear and express language." Sprague v.

Gen. Motors Corp., 133 F.3d 388, 400 (6th Cir. 1998).   Plaintiff has the burden of proving an

intent to vest.  See id.  "Welfare benefits vest, if at all, based on the terms of the Plan." Price II,

707 F.3d at 651 (citation omitted).

With this law in mind, the Court turns to the relevant Plan provisions.  The 1998 Plan

provides, "After a claim is approved, benefits are paid monthly.  Your monthly payments will

continue for the maximum benefit period allowed provided you continue to be totally disabled

according to the Plan." A.R. 717.  The 1998 Plan also contains the language that both parties

focused on in their supplemental briefs: "The Company expects to continue this Plan

indefinitely, but reserves the right to amend, discontinue, or terminate the Plan at any time either

by action of its Board of Directors or by one or more officers of the Company.  Any change or

cancellation would not effect [sic] benefits of an established claim . . . ." A.R. 704.

These provisions contain a reservation-of-rights clause: the Plan reserves the right to

"amend, discontinue, or terminate the Plan at any time."  An unqualified reservation-of-rights

clause indicates that benefits were not vested.  See Haviland v. Metro. Life Ins. Co., __F.3d__,

2013 WL 4838815, at *4 (6th Cir. Sept. 12, 2013) ("[T]he language in the Plan stating that

benefits would continue for life does not vest the continuing life insurance benefits because the

Plan also contains an unambiguous reservation of the right to amend or terminate the Plan.").

11

However, in this case, the reservation-of-rights clause contains a limitation: "Any change or cancellation would not effect [sic] benefits of an established claim . . . ."  Plaintiff asserts that pursuant to this language, her benefits are vested.  Neither party has cited a Sixth Circuit case analyzing whether this language – or substantially similar language – results in vested disability benefits.[4]  The Court notes, however, that while the Sixth Circuit has not explicitly determined whether such language results in vested benefits, it has indicated that language barring a plan modification from affecting established benefits weighs against finding a full reservation of the right to amend or modify a plan.  In Price v. Bd. of Tees. of the Indiana Laborer's Pension Fund (Price I), 632 F.3d 288, 296 n.2 (6th Cir. 2011), the Sixth Circuit distinguished Gibbs, 440 F.3d 571, from Price on the ground that in Gibbs:

> [T]he welfare benefits plans at issue did not contain explicit language reserving the right to amend or revoke the challenged benefits, while the Plan at issue here does.  In fact, in Gibbs, the plan contained a provision expressly stating that 'any modification or termination will not affect [the employee's] right to benefits from a covered disability that occurred before the termination or modification.'

Under the Sixth Circuit's analysis in Price I, the limiting language at issue here does have

---

[4] Defendants rely on a Sixth Circuit case, Price II, 707 F.3d at 651.  In Price II, the court considered plan language stating that "no amendment shall be made which results in reduced benefits for any Participant whose rights have already become vested under the provisions of the Plan on the date the amendment is made."   The Sixth Circuit had concluded in a prior opinion that Plaintiff's benefits were not vested.  Id. at 652.  Therefore, the issue before the Sixth Circuit in Price II was not whether plan language limiting a right to amend a plan results in vested benefits; instead, the issue was whether the plan language quoted above could be invoked to prevent retroactive amendment of non-vested disability benefits.  Price II is therefore not directly on-point to the Court's current analysis.

Plaintiff does not cite a Sixth Circuit case, and instead relies on a Second Circuit case, Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571 (2d Cir. 2006), in which the court, applying a presumption in the Second Circuit that welfare benefits vest absent express language to the contrary, concluded that the claimant's benefits were vested.  Because the presumption of vesting applied by the Second Circuit is contrary to the presumption against vesting applied by the Sixth Circuit, the analysis in Gibbs is not directly on-point to whether Plaintiff's benefits are vested.

some import: it restricts the ability of the Plan administrator to apply Plan amendments to existing benefits claims.  The Court, therefore, rejects Defendants' argument that the language does not vest Plaintiff's benefits in any way and does not limit the administrator's right to amend or modify the Plan.  To hold that the phrase "[a]ny change or cancellation would not effect benefits of an established claim" does not qualify or limit the reservation-of-rights clause would render the quoted phrase superfluous and meaningless.  "Contracts should not be read so as to render language superfluous."  Jenkins v. U.S.A. Foods, Inc., 912 F. Supp. 969, 975 (E.D. Mich. 1996).  The "would not effect benefits" phrase does impose some limitation on the reservation-of-rights clause; the question is, what is the scope of that limitation?

Defendants also suggest that the phrase could be construed to mean that no amendment would require a claimant to return benefits already received or alter benefits for which payments have become due.  Def. Proposed Rep. Br. at 3 (Dkt. 41-2).  In support of this suggested interpretation, Defendants point to Hackett v. Xerox Corporation Long-Term Disability Income Plan, 315 F.3d 771, 774 (7th Cir. 2003), in which the court interpreted a plan provision stating that the plan could not be amended in a way that would "diminish any rights accrued for the benefit of the participants prior to the effective date of the amendment," to mean that "no amendment shall require [the claimant] to return benefits he has already received or alter benefits for which the payments have become due."  Def. Proposed Rep. at 3 (Dkt. 41-2) (quoting Hackett).  The Hackett court noted that "[r]ights to [welfare] benefits do not accrue prospectively.  [The claimant] did not, upon initial determination of eligibility, accrue a right to benefits indefinitely; instead his right to those benefits accrues as the payments become due." Hackett, 315 F.3d at 774.  Therefore, reasoned the court, the plan provision barring amendments that would diminish any rights accrued only meant that no amendment could compel a claimant

to return benefits checks that had already been paid or for which the payments had become due.

The Court concludes, however, that <u>Hackett</u> is distinguishable. Unlike the plan language at issue in <u>Hackett</u>, the provision at issue in the instant case states that "[a]ny change or cancellation would not effect benefits of an established claim" – it does not state that "[a]ny change or cancellation would not effect **accrued** benefits of an established claim." In other words, where the <u>Hackett</u> provision prohibited the application of amendments that would affect accrued benefits, the provision at issue here prohibits the application of amendments that would affect all "benefits of an established claim." Therefore, interpreting the phrase "benefits of an established claim" to mean "benefits that have already been paid or become due" would read into the phrase a limitation that is not present in its plain language. Absent explicit language indicating that this limitation on the right to amend is confined to plan amendments that would affect already-accrued benefits (such as the language at issue in <u>Hackett</u>), the Court will not read this limitation on the reservation-of-rights clause so narrowly.

Therefore, the Court concludes that the only reasonable interpretation of the phrase "[a]ny change or cancellation would not effect [sic] benefits of an established claim" is that any change to Plan terms may not be applied to a previously-established claim if the application of the amended terms would affect the past, current, or future benefits of that claim. Any other interpretation of the phrase would go against the plain language of the Plan terms. Therefore, even if Defendants' interpretations of this Plan language are entitled to deference due to the administrator's grant of discretion to interpret the terms of the Plan, <u>see</u> <u>Price II</u>, 707 F.3d at 652, Defendants' proposed interpretations of the Plan provision are not reasonable and would not be upheld.

The Court notes that the Plan provision does not vest the benefits of an ongoing claim in

14

the sense of rendering those benefits "forever unalterable," Sprague, 133 F.3d at 400, because the existing benefits would still be subject to the eligibility limitations and requirements in the Plan that were in effect when the benefits were awarded.  However, any ongoing award of benefits would only be subject to subsequent Plan amendments if those Plan amendments did not affect the benefits.[5]  The Court concludes that this interpretation, which enforces the plain language of the provision at issue, best aligns with the purpose of the ERISA statute "to protect contractually

---

[5] In their supplemental briefing, Defendants rely on the Sixth Circuit's analysis in Price II, 707 F.3d 647.  In Price II, the court construed two relevant provisions of an ERISA welfare benefits plan.  The first provision read, "Any amendment to the Plan may be made retroactively by the majority action . . . ."  Price II, 707 F.3d at 651.  The second provision read, "No amendment shall be made which results in reduced benefits for any Participant whose rights have become vested under the provisions of the Plan on the date the amendment is made."  Id.  The Board of Trustees for the plan interpreted the first provision to mean that "any amendment, including amendments to disability benefits after the disability occurs, may be made retroactively by majority action."  Id. at 652.

The court upheld this interpretation as not arbitrary or capricious.  Id.  The court noted that there was no language in the plan that contradicted the right to amend disability benefits.  Id. at 651-652.  In particular, the court noted that, as it found in a prior case analyzing the same plan, the term "vesting" in the plan referred specifically to retirement benefits, not disability benefits.  Id. at 652 (citing Price I, 632 F.3d at 296-298).  Therefore, the provision stating that "No amendment shall be made which results in reduced benefits for any Participant whose rights have become vested under the provisions of the Plan on the date the amendment is made" only referred to retirement benefits.  Id.  Because there was no language in the plan contradicting the Board's interpretation, the Board's interpretation of the ambiguous provision was reasonable and was entitled to deference.  Id.

However, Price II is not directly analogous to the instant case.  In the instant case, unlike in Price II, there does exist Plan language contradicting the unlimited right to amend disability benefits.  Furthermore, the Price II court's decision turned on its prior conclusion that disability benefits in the plan at issue were not vested; in the instant case, the Court has not made any prior determination regarding whether or not Plaintiff's benefits were vested – indeed, whether and to what extent the benefits were vested is a key, disputed issue before the Court.  In Price II, the court concluded that the provision at issue was ambiguous and therefore subject to multiple reasonable interpretations.  In the instant case, the Court – construing plan language different from that at issue in Price II – concludes that the plan provision at issue unambiguously prohibits the Plan administrator from applying Plan amendments to an established claim if the amendments would affect the benefits of the claim.

For these reasons, Price II is distinguishable and does not control the outcome of the instant case.

defined benefits." Firestone, 489 U.S. at 113.

The question then becomes whether the amended Plan provisions regarding the delegation of authority affected Plaintiff's benefits. Plaintiff's claim became established in 1998. Therefore, if any amendments implemented after 1998 would affect Plaintiff's benefits, those amendments may not be applied to Plaintiff's claim.

**b.  Whether the 2005 Plan and 2010 Policy Provisions Regarding Discretion Affected Plaintiff's Benefits**

Plaintiff argues that the "switch" to a discretionary standard of review in the 2005 Plan and the 2010 Policy affected her benefits and, therefore, could not be applied to her. While Plaintiff concedes that the 1998 Plan provides Dayton-Hudson with discretionary authority, "its discretion is limited 'to interpret the terms of the Plan.'" Pl. Memo at 2.  This argument lacks merit.  There was no "switch" to a discretionary standard of review because the 1998 Plan contains a grant of discretion sufficient to warrant deferential review.

The 1998 Plan provides that Principal makes the original benefits determinations.  A.R. 717.  If Principal denies or terminates benefits, the claimant may appeal the decision, first to Principal and then to Dayton-Hudson, the Plan administrator.  A.R. 717.  The final benefits decision on appeal would be rendered by the Plan administrator.  A.R. 717.  The 1998 Plan provides that the Plan administrator has the discretionary authority to interpret the terms of the plan; under Supreme Court precedent, this language is sufficient to trigger arbitrary and capricious review of the administrator's decision.  See Firestone, 489 U.S. at 115 ("[A] denial of benefits . . . is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.").  Because there existed a grant of discretionary authority in the 1998 Plan, the 2010 Plan, in including a provision for discretionary review, did not amend the

1998 Plan.[6]

      **c.   Whether the 2005 Plan and 2010 Policy Provisions Regarding Delegation of Authority Affected Plaintiff's Benefits**

The Court notes that the 2005 amended Plan added language providing for an administrator to delegate fiduciary authority to a third party, and the 2010 Plan appointed Hartford as the claims administrator. However, because Plaintiff has not shown that these amended Plan terms affected her substantive entitlement to benefits, the Court concludes that these amendments may be applied to Plaintiff's claim.

In determining whether a plan amendment affects benefits, courts have drawn a distinction between procedural amendments regarding claims administration and amendments regarding a claimant's substantive eligibility for, or entitlement to, benefits. See, e.g., Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 195-197 (3d Cir. 2002). Courts have held that a plan amendment that only alters a procedural or administrative aspect of a benefit determination does not affect a claimant's benefits, and therefore may be retroactively applied. See id. at 195 (concluding that a plan amendment adding a grant of discretionary authority to the administrator was a procedural amendment that did not change the plaintiff's benefits); contra Gibbs, 440 F.3d at 576-577 (concluding that an

---

[6] Plaintiff relies on Gibbs, 440 F.3d 571, to support her argument that the grant of discretion in the later Plan documents affected her benefits, but Gibbs is distinguishable. In Gibbs, the court concluded that an amendment adding a grant of discretionary authority affected the plaintiff's substantive entitlement to benefits. The court, applying Second Circuit law, first concluded that the plaintiff's welfare benefits had vested at the time the plaintiff became disabled. Id. at 576-577. The court then explained that an amendment that changed the standard of review applicable to a claims decision substantively affected the claimant's benefits, because "a right that may be denied by an administrator's incorrect, but not arbitrary, interpretation of the plan is substantively diminished as compared with one not subject to erroneous decision." Id. at 577-578. However, unlike in Gibbs, the Plan in effect when Plaintiff was first awarded benefits did contain a grant of discretion to construe the terms of the Plan, and therefore the 2005 and 2010 Plan documents did not amend the applicable standard of review.

amendment adding a grant of discretion did affect the plaintiff's substantive entitlement to benefits, because it affected the standard of review applicable to the plaintiff's claim).

Plaintiff has not argued that the Plan amendments providing for delegation procedures or appointing Hartford, as opposed to Principal, as claims administrator have affected her benefits; nor has she pointed to authority demonstrating that amending a plan to allow for a third party to make claims decision substantively affects her benefits. Furthermore, the Court notes that the 1998 Plan already provided for a third party, Principal, to make initial claims decisions; based on the Plan documents before the Court, it is a reasonable inference that the 1998 Plan, like the later Plans, contemplated the possibility of delegating fiduciary tasks to third parties. Because Plaintiff has not shown that the appointment of Hartford in particular as a third-party administrator substantively affected her benefits, the Court will apply the amended delegation provisions in the 2005 and 2010 Plan and Policy documents. See also Corvi v. Eastman Kodak Co. Long Term Disability Plan, 01-cv-365, 2001 WL 484008 (S.D.N.Y. May 8, 2001) (concluding that the plan administrator's delegation of authority to a third party to make benefits decisions did not affect the plaintiff's entitlement to vested benefits).

The Court will apply the terms of the 2010 Policy.

**B. The Michigan Anti-Discretionary Clause Regulation**

The grant of discretionary authority in the 2010 Policy to determine eligibility for benefits and to interpret the terms of the Plan is sufficient to warrant applying the deferential "arbitrary and capricious" standard of review. See Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996) ("[A]pplication of the highly deferential arbitrary and capricious standard of review is appropriate only when the plan grants the administrator authority to determine eligibility for benefits or to construe the terms of the plan.").

However, Plaintiff argues that the Michigan anti-discretionary clause regulation prohibits the grant of discretionary authority to Hartford in the 2010 Policy, because the 2010 Policy constituted a post-2007 Plan revision.  Pl. Br. on Mot. for J. at 6-7 (Dkt. 22).  Plaintiff also contends that the Michigan anti-discretionary clause regulation was triggered when the letters were sent to her, because the letters constituted a revision to the SPD. Because, Plaintiff argues, the letters would have been delivered to her in Michigan after 2007, any grant of discretion in the letters is barred by the Michigan regulation.  Pl. Resp. at 1-2 (Dkt. 24); Pl. Rep. at 1 (Dkt. 27).[7]

Defendants contend that the Michigan regulation is not triggered, because the Policy was issued to Target in Minnesota, not to Plaintiff in Michigan.  Def. Br. on Mot. for J. at 14-15 (Dkt. 21); Def. Resp. at 4 (Dkt. 25); Def. Rep. at 1 (Dkt. 26).  Defendants also argue that the letters are consistent with Plan terms, and did not make changes to the Plan and Policy.  Def. Resp. at 6-7; Def. Rep. at 3-4.

In light of these arguments, the Court turns to the applicable law.  The Michigan anti-discretionary clause regulation provides, in pertinent part:

(a) A discretionary clause unreasonably reduces the risk purported to be assumed in the general coverage of the policy within the meaning of MCL 500.2236(5).

(b) On and after [July 1, 2007], an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

---

[7] Plaintiff also argues that there is no evidence the letters were ever sent to her, and that because the grant of discretion in the letters constituted a material modification to the Plan, Hartford's failure to send the letters to Plaintiff breached the notice and disclosure requirements of ERISA. Id. at 8-9.  The Court notes that these arguments seem to be inconsistent with Plaintiff's argument, above, that the letters triggered the Michigan anti-discretionary clause regulation.  In response to Plaintiff's argument, Defendants argue that they reasonably relied on mailing the letters to Plaintiff, and that there is evidence Plaintiff received and responded to correspondence from Hartford.  Def. Resp. at 6 (Dkt. 25): Def. Rep. at 3 (Dkt. 26).

> (c) On and after [July 1, 2007], a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code. R. 500.2202. The Sixth Circuit has upheld this rule, concluding that it was not preempted by ERISA. <u>Am. Council of Life Insurers v. Ross</u>, 558 F.3d 600, 608-609 (6th Cir. 2009).

Plaintiff argues that the Michigan anti-discretionary clause regulation was triggered by (i) the 2010 Policy, and (ii) the 2009 and 2010 form letters. The Court, however, concludes that neither the 2010 Insurance Policy, the 2010 Policy Certificate, nor the form letters triggered the regulation, because there is no evidence that any of these documents were issued or delivered in Michigan.

First, as Defendant contends, the Insurance Policy was issued to Target, which is headquartered in Minnesota. A.R. 738; A.R. 679; A.R. 694. Because the Policy itself was not issued in Michigan, the Policy document does not trigger the Michigan regulation.

However, the administrative record also contains an Insurance Policy Certificate, which is incorporated into and made a part of the Plan and the Insurance Policy. A.R. 679; A.R. 743. The Certificate appears to be addressed to the Plan participants. A.R. 679 ("The provisions of The Policy, which are important to You, are summarized in this certificate . . . ."); A.R. 688 ("You or Your means the person to whom this certificate is issued.").

If the certificate was issued to Plaintiff while Plaintiff was in Michigan, then by the plain language of the Michigan regulation, the Michigan regulation would be triggered and the grant of discretion in the Policy Certificate would be barred. <u>See</u> Mich. Admin. Code. R. 500.2202(c) ("On and after [July 1, 2007], a discretionary clause issued or delivered to any person in this

20

state in a policy, contract, rider, indorsement, <u>certificate</u>, or similar contract document is void and of no effect.") (emphasis added).

Defendants rely on <u>New England Mut. Life Ins. Co. v. Gray</u>, 786 F.2d 406, 408-409 (6th Cir. 1986) for the proposition that where an insurance policy is issued to a policyholder outside of Michigan, the insurer did not "issue or deliver" its policy in Michigan. <u>Gray</u>, however, is not directly on point. In <u>Gray</u>, 786 F.2d at 407-408, the Sixth Circuit analyzed a Michigan Insurance Code provision requiring that "no [group disability insurance] policy may be issued or delivered in this state unless a copy of the form shall have been filed with the commissioner and approved by him." <u>See</u> Mich. Comp. Laws § 500.3606(2). The policy in <u>Gray</u> was issued in Minnesota, and a certificate of insurance was sent to beneficiaries in Michigan. <u>Gray</u>, 786 F.2d at 408. The court held that the issuance of a certificate to a beneficiary in Michigan did not constitute issuance or delivery of the insurance policy within the meaning of Mich. Comp. Laws § 500.3606(2). <u>Id.</u> at 409. The court explained, "There may be valid reasons for applying the approval requirement of section 500.3606 to group disability insurance policies issued outside of Michigan when some of the beneficiaries of those policies reside in Michigan. However, the Michigan legislature and courts have not extended the approval requirement to out-of-state-issued policies . . . ." <u>Id.</u> at 409.

<u>Gray</u> does not change the Court's conclusion that the issuance of a Policy Certificate to a beneficiary in Michigan would trigger the Michigan anti-discretionary clause regulation. The analysis in <u>Gray</u> was specific to Mich. Comp. Laws § 500.3606(2), and section 500.3606(2) only referred to insurance policies and had no mention of certificates. Furthermore, the court expressly noted that while there may be "valid reasons" for extending a Michigan insurance code regulation to policies issued outside Michigan when some beneficiaries of the policy reside in

Michigan, the "Michigan legislature and courts" had not extended the approval requirement contained in section 500.3606(2) to out-of-state policies.

However, unlike section 500.3606(2), the Michigan anti-discretionary clause regulation is expressly triggered by certificates issued in Michigan: it bars any discretionary clause in a "policy, contract, rider, indorsement, certificate, or similar contract document."  By expressly covering both policies and certificates, the anti-discretionary clause regulation contemplates a situation where a policy is issued outside the state but a certificate is sent to a beneficiary within Michigan.  Therefore, the express language of this regulation, along with the Sixth Circuit's note in <u>Gray</u> that there may be valid reasons for extending insurance regulations to out-of-state policies when some policy beneficiaries reside in Michigan, supports the Court's conclusion that the issuance of the Policy Certificate to Plaintiff in Michigan would have triggered the regulation.

There is, however, no evidence in the administrative record that the Policy Certificate was actually sent to Plaintiff.  In fact, Plaintiff herself maintains that there is no evidence the Policy Certificate was ever sent to her.  Pl. Resp. at 3-4.  Furthermore, even if the Certificate was sent to her, it is unclear whether it would have been sent to her in Michigan, because it is unclear from the record when Plaintiff moved to Michigan.  The administrative record indicates that on December 31, 2009, Plaintiff informed Hartford that she would be moving to Michigan, A.R. 68-69; Plaintiff also reported that in 2009, she had to sell her home in Minnesota and "find a new home" in Michigan.  A.R. 391.  Therefore, it seems apparent that Plaintiff moved to Michigan sometime in 2009, 2010, or 2011 – most likely 2010, according to Plaintiff's statement to Hartford on December 31, 2009 – but neither party has pointed to clear evidence of when Plaintiff became a Michigan resident.  Absent evidence that the Policy Certificate was sent to

Plaintiff in Michigan, the Court cannot say that the Policy Certificate triggered the Michigan anti-discretionary clause regulation. The grant of discretion in the 2010 Policy Certificate, which was incorporated into the Policy, remains valid. See Foorman v. Liberty Life Assur. Co. of Boston, No. 12-927, 2013 WL 1874738, at **2-3 (W.D. Mich. May 3, 2013) (concluding in part that the Michigan ban on discretionary clauses did not apply to a policy that was issued to an employer located in Pennsylvania, where there was no indication the employer issued any certificates of insurance in Michigan).

Next, Plaintiff argues that the 2009 and 2010 letters constituted revised SPDs and therefore triggered the Michigan anti-discretionary clause regulation. The Court notes, however, that Plaintiff's arguments regarding the letters are inconsistent: she maintains that the letters were never sent to her, but then contends that the letters triggered the Michigan regulation – which would only be possible if the letters were issued to her in Michigan. Regardless, the Court concludes that, as Plaintiff maintains, there is no evidence in the administrative record that the letters were sent to Plaintiff. Although Defendant argues that it reasonably relied on mailing the letters to Plaintiff, there is no evidence the letters were mailed – or even addressed – to Plaintiff. There is also no evidence that Plaintiff would have been residing in Michigan at the time she would have received the letters. Because there is no evidence the letters were delivered in Michigan, Plaintiff has not met her burden of showing that the letters triggered the Michigan anti-discretionary clause regulation.

Furthermore, the letters, even if they were sent to Plaintiff, would not have triggered the Michigan regulation, because the letters were not a "policy, contract, rider, indorsement, certificate, or similar contract document." Mich. Admin. Code. R. 500.2202. Plaintiff seems to argue that the letters constituted revised SPDs. Pl. Rep. at 1. Under ERISA, a summary plan

23

description must contain certain information, including the names and addresses of the issuer, the agent for service of legal process, and the administrator, as well as the plan's requirements regarding eligibility for participation. 29 U.S.C. § 1022(a). The letters contain none of this information, and the Court concludes that the letters cannot be deemed SPDs under ERISA. Nor has Plaintiff argued, or demonstrated, that the letters could be construed as a kind of contract document other than an SPD, whether that be a plan description, annual report, bargaining agreement, trust agreement, contract, or "other instrument under which the plan is established or is operated." 29 U.S.C. § 1024(b)(4). Because Plaintiff has not shown that the letters constituted SPDs or other contract documents, and because there is no evidence the letters were sent to Plaintiff in Michigan, the letters do not trigger the Michigan anti-discretionary clause regulation.

For these reasons, the Michigan regulation does not bar the grant of discretion in the Policy and Plan documents.[8]

## C. Delegation of Authority to Hartford

---

[8] The Court notes that Plaintiff's arguments seem to raise a claim that Hartford failed to meet the notice and disclosure requirements of ERISA. Plaintiff argues that the 2010 Policy was never sent to her and does not apply to her; she further argues that there is no evidence the letters were sent to her. Pl. Resp. at 3-4. However, Plaintiff does not cite any authority to support her assertion that Hartford could not rely on a grant of discretion in documents it did not provide to Plaintiff. Indeed, the ERISA statute provides for specified statutory penalties for the failure to notify plan participants of material modifications to the plan, but these penalties do not include the invalidation of a plan document that was not disclosed. See 29 U.S.C. § 1132(c)(1) (providing that a court may order penalties up to $100 a day for failing to disclose material information to participants). Furthermore, the Sixth Circuit has indicated that the failure to provide required information to plan participants does not, in and of itself, warrant a benefits award. See Lewandowski v. Occidental Chemical Corp., 986 F.2d 1006, 1009 (6th Cir. 1993) ("Nothing in § 1132 suggests that a plan beneficiary should receive a benefit award based on a plan administrator's failure to disclose required information."). Therefore, even if Hartford failed to send Plaintiff the 2010 Policy and the form letters in violation of its ERISA notice and disclosure requirements, such violation would not entitle Plaintiff to the remedy she seeks: an award of benefits.

Plaintiff argues that Hartford was not properly delegated discretionary authority, and that because it was an unauthorized decision-maker, de novo review applies to its decision. Pl. Br. on Mot. for J. at 10. Defendants respond that the 2010 Policy expressly designates Hartford as a claim fiduciary with discretionary authority, and because Hartford was properly authorized as a decision-maker with discretionary authority under the Plan, deferential review applies to Hartford's decision.  Def. Resp. at 4-5.

"It is well established that an ERISA fiduciary may delegate its fiduciary responsibilities to either another named fiduciary or a third party if the plan establishes procedures for such delegation." Lee v. MBNA Long Term Disability & Benefit Plan, 136 F. App'x 734, 742 (6th Cir. 2005) (citing § 1105(c)(1)).  If there is a proper delegation of authority by a named fiduciary with discretionary authority, then discretionary review applies to the designated fiduciary as well as to the named fiduciary.  Id. (citing Madden v. ITT Long Term Disability Plan, 914 F.2d 1279, 1283 (9th Cir. 1990)).  A delegation of authority is proper if the plan instrument provides for delegation procedures, and if such procedures are followed.  Lee, 136 F. App'x at 742.

In the instant case, the 2005 Plan provides, "A Named Fiduciary by written instrument may designate a person or persons other than such Named Fiduciary to carry out any or all of the fiduciary responsibilities under the Plan of such Named Fiduciary."  A.R. 754.  The 2010 Policy provides, "The Plan has granted the [Hartford] Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the policy." A.R. 693.   Therefore, the Plan contained procedures for delegation – by written instrument – and the Policy, which was a written instrument, clearly delegated Hartford with discretionary authority.  Under the Sixth Circuit's analysis in Lee, such delegation of authority was proper, and entitles the decision-maker to deferential review.

25

For all of the above reasons, the Court applies the deferential "arbitrary and capricious" standard of review.

## IV.    ANALYSIS

### A. Plaintiff's Employment and Medical Background

#### 1.   Plaintiff's Employment

Plaintiff attended the University of Minnesota, graduating in 1985 with a B.S. in Business Administration.  A.R. 157.  After graduating, Plaintiff worked as an internal financial and audit coordinator, managing and performing audits at Bache Brokerage Firms and at Dayton-Hudson.  A.R. 488.  Plaintiff subsequently worked as a policy/culture coordinator and debit balance specialist at Dayton-Hudson.  A.R. 488.  At the time Plaintiff's disability began, she worked as a Supervisor-Accounts Payable.  A.R. 485.  This job included responsibility for vendor payments, implementation of the payables system, document management, and coordinating and communicating with others.  A.R. 485.  Plaintiff has not worked since 1997. A.R. 158.

#### 2.   Initial Claim for Long-Term Disability (LTD) Benefits

Plaintiff first applied for LTD benefits in 1997. A.R. 656.  Plaintiff attached to her disability application a statement from her attending physician, Dr. Karla Grenz.  A.R. 657.  Dr. Grenz reported a diagnosis of fibromyalgia and chronic fatigue syndrome, with subjective symptoms of pain, fatigue, sleep disorder, and difficulty concentrating.  A.R. 657.   Dr. Grenz indicated that Plaintiff was unable to perform any duties related to her current job, and that there were no modifications to her job that would enable Plaintiff to work.  A.R. 657.  On April 7, 1998, Plaintiff was approved for LTD benefits.  A.R. 591-592.

#### 3.   Hartford's Review – 2009

On December 29, 2009, Hartford contacted Plaintiff, requiring supplemental information

26

about Plaintiff's disability.   A.R. 29.   Hartford instructed Plaintiff to complete a claimant questionnaire, a retirement questionnaire, and an attending physician statement (APS) of functionality.  A.R. 29.

Dr. Grenz submitted an APS on Plaintiff's behalf.   A.R. 386-387.   Dr. Grenz saw Plaintiff on May 28, 2009, and indicated that Plaintiff was on several medications.  A.R. 386. The APS reiterates the diagnoses of fibromyalgia and chronic fatigue syndrome, with symptoms of fatigue, chronic pain, and sleep disturbance, as well as multiple tender points.  A.R. 386.  The APS indicates that Plaintiff can occasionally lift up to 10 pounds, can occasionally bend at the waist, must avoid kneeling or crouching, can occasionally reach, and must alternate sitting, standing, and walking, depending on her symptoms.   A.R. 387.   The APS states that these restrictions are permanent.  A.R. 387.

Plaintiff also submitted a claimant questionnaire, along with an appended typed statement summarizing her abilities.   A.R. 389-392.   The questionnaire indicates that Plaintiff has increased back and neck pain and severe plantar fasciitis. A.R. 389.  Plaintiff stated that she sees a movie once per week and eats out once or twice per week.  A.R. 389.  She also stated that she is proficient in "very basic computer operations."   A.R. 389.   In her typed statement, Plaintiff indicates that she experiences constant fatigue, and that although she knows what to do to keep her symptoms "at a tolerable level," she is not always able to do so.  A.R. 390.  She states that she cannot sit in front of a computer for more than 30 minutes due to pain in her back and neck, and she avoids strenuous activities.   A.R. 390.   She states that she must rest frequently on shopping trips and during exercise or cleaning chores.   A.R. 390.   She can handle activities during important events or vacations due to adrenaline, but she "pay[s] for it after the fact."  A.R. 390.   Plaintiff reports that she deals with various stressors that take a toll on her health,

including caring for a teenage grandson with ADHD, handling paperwork and legal dealings as a result of being granted power of attorney by her parents, and selling her home and moving to Michigan.  A.R. 390-392.

### 4.  Medical Reports

#### a.  Dr. Grenz – treating physician until 2009

In 1999, Dr. Grenz diagnosed Plaintiff with fibromyalgia and chronic fatigue disorder.  In 2001, Dr. Grenz reiterated the diagnoses of fibromyalgia and sleep disorder, and stated that she would not anticipate full recovery.  A.R. 469.  In 2003, Dr. Grenz reported that Plaintiff's condition is chronic and there was no expectation of full recovery.  A.R. 498.  In 2006, Dr. Grenz again indicated that the condition was ongoing and significant change was not anticipated.  A.R. 538.  In 2011, Dr. Grenz submitted a letter stating that she had not seen Plaintiff since December 2009, but that Plaintiff "has struggled with chronic pain, easy fatigability, sleep disturbance and mental fogginess.  Her symptoms are aggravated by stressful situations and she would not be able to manage working a job and maintaining consistent hours and performing physical duties." A.R. 161.

#### b.  Dr. Jennings – treating physician, 2009 – present

In February 2011, Dr. Nadine S. Jennings reported that Plaintiff has pain in the lower back, has intermittent paresthesias in the right foot, is careful with her routine activities, has been using medications and patches with some benefit, received updated x-rays indicating moderate to severe degenerative changes with spondylolisthesis, and received an MRI indicating disc protrusion.  A.R. 206.  Dr. Jennings's physical examination indicated pain and tenderness over lower lumbar area, with full motor strength.  A.R. 206.  Dr. Jennings noted that Plaintiff would proceed with epidural steroid injections.  A.R. 206.

In May 2011, Dr. Jennings reported that Plaintiff is unable to sit for extended periods of time without frequent rest breaks, and she is unable to be gainfully employed.  A.R. 353.  In September 2011, Dr. Jennings stated that Plaintiff remains disabled and unable to work due to her chronic severe pain and limitations in her sitting, standing, and walking tolerance.  A.R. 120.

### c.  Diagnostic tests, 2010-2011

In December 2010, a diagnostic test indicated no fractures or compression deformities, but severe narrowing and degenerative changes in discs with no spondylitis.  A.R. 121.  In September 2011, an MRI revealed marked degenerative disc disease in the C5 disc and degenerative disc disease in the C6 disc, with some disc protrusion.  A.R. 113-114.

### d.  Reporting of pain and fatigue

In February 2011, Plaintiff reported that prolonged sitting and bending aggravates her pain, but that she performs her own housework.  A.R. 205, 208.  She further reported fair/adequate pain relief using Ibuprofenwork.  A.R. 205, 208.  After receiving epidural injections, Plaintiff reported lower pain levels and increased strength.  A.R. 226.  Dr. Marie Delewski reported in 2010 that after the injections, Plaintiff had no local pain to palpation in the lumbar spine, good strength, and full range of motion.  A.R. 226.  Dr. Delewski further reported that the injections improved Plaintiff's foot pain, and that Plaintiff was able to walk through Disney World on a vacation.  A.R. 337.

In January 2011, Dr. Jennifer Prohow, Plaintiff's family doctor, reported that Plaintiff in general has a normal activity and energy level, with no fatigue or malaise, with appropriate mood and affect, and normal attention and concentration.  A.R. 276-277.

### 5.  Hartford's Review – 2011

In 2011, Hartford conducted a review of Plaintiff's file for updated functionality.  A.R.

60, 66-67.   As part of this review, Plaintiff submitted updates regarding her restrictions and limitations.  A.R. 182-191.  Plaintiff reported that she has learned how to manage her illnesses and do what she can to function, but that she has experienced degenerative changes and increased joint pain as she has aged.  A.R. 187.  Plaintiff stated that stress causes flare-ups, and that she must move around and take Ibuprofen to manage discomfort.  A.R. 187.  She reported that trouble sleeping leads to increased pain, as well as "fog" and mental fatigue.  A.R. 188.  She states that she struggles with taxes.  A.R. 188.  In a normal day, Plaintiff does low-intensity exercise, does some housework and cleaning, does some shopping or runs errands, prepares dinner, and rests throughout the day.  A.R. 187-189.  She states that she needs to avoid looking at a computer, and must move around every hour if she is sitting.  A.R. 188.  Plaintiff can go up to a month functioning "relatively well" as long as she has no stress.  A.R. 189.

Hartford requested an independent medical examination of Plaintiff, which was conducted on May 16, 2011, by Dr. Cheryl Lerchin.  A.R. 174.  Dr. Lerchin reviewed Plaintiff's past medical history, including diagnostic tests, and concluded that Plaintiff's reports of spinal pain were supported by the degenerative changes leading to stenosis in the spine.  A.R. 177.  Dr. Lerchin's physical examination of Plaintiff indicated that Plaintiff was alert and oriented, with a full range of motion and full strength.  A.R. 176-177.

Dr. Lerchin also reported on Plaintiff's functional limitations.  Dr. Lerchin reported that Plaintiff could sit for 7 hours per 8-hour day, with a one-minute break to stand and stretch each half hour; Plaintiff could stand for 30 minutes at a time for a total of 2 hours per 8-hour day; Plaintiff can lift and carry 20 pounds occasionally; Plaintiff can reach occasionally; and Plaintiff can perform constant fingering/handling motions.  A.R. 178.

The independent medical examination report was submitted to Plaintiff's treating

30

physicians.  Dr. Jennings responded, indicating that she disagreed with the independent medical evaluation, and that she considered Plaintiff totally disabled.  A.R. 167.

### 6.  Hartford's Employability Analysis

In July 2011, Hartford conducted an employability analysis, based on a functional capacity of sedentary work with unlimited sitting, two hours total of standing and walking, lifting/carrying 20 pounds occasionally, and constant fingering/handling.  A.R. 131.  The wage requirement for the employability analysis was 128% of the monthly benefits payment, i.e, $3,724.  A.R. 2, 591.  Hartford determined that there was an occupation meeting the wage requirement and job skills transferability requirement for Plaintiff: Supervisor – Accounting Clerks, with a wage of $3,908.67 per month.[9]  A.R. 132.  A Supervisor – Accounting Clerks "supervises and coordinates activities of workers engaged in calculating, posting, verifying, and typing duties to obtain and record financial data for use in maintaining accounting and statistical records."  A.R. 135.

### 7.  Hartford's Termination of Plaintiff's Benefits

On August 8, 2011, Hartford terminated Plaintiff's benefits.  A.R. 8-14.  Hartford concluded that Plaintiff no longer satisfied the definition of "total disability" under the Plan. A.R. 8.  The denial letter reviewed Plaintiff's medical records, including reports from Dr. Delewsky, Dr. Prohow, and Dr. Lerchin, as well as Dr. Jennings's disagreement with Dr. Lerchin's independent medical evaluation.  A.R. 10-13.  The denial letter noted that Dr. Grenz had not treated Plaintiff since 2009.  A.R. 12.  The denial letter discussed Dr. Lerchin's

---

[9] The original employability analysis conducted by Hartford in 2011 produced three occupations that met the wage and transferability requirements for Plaintiff: Supervisor – Accounting Clerks; Personnel Scheduler; and Procurement Clerk.  A.R. 132.  In responding to Plaintiff's appeal, Hartford revised this determination and concluded that only the position of Supervisor – Accounting Clerks met the wage and transferability requirements for Plaintiff.  A.R. 2.

conclusion that Plaintiff has spinal pain, but that she is capable of sitting for 7 hours in an 8-hour day.   Hartford concluded that based on the medical information in Plaintiff's file, including Dr. Lerchin's physical capacity analysis, Plaintiff was capable of performing full-time sedentary work.  A.R. 13.

Plaintiff appealed the termination of her LTD benefits.  A.R. 106-112. On March 14, 2012, Hartford informed Plaintiff that it had completed its appeal review and determined that Plaintiff was not disabled, because Plaintiff had the functionality to perform the occupation of Supervisor – Accounting Clerks, which meets the wage requirements.  A.R. 1-2.  As part of the appeals process, Hartford sought an independent physician review of the documentation in the file from Dr. Denise Davis.  A.R. 2.

Dr. Davis's file review summarizes the medical reports of Plaintiff's physicians.  A.R. 81-88.  Dr. Davis concluded that as of August 8, 2011, Plaintiff was capable of sedentary work, with limitations of a sit/stand option, standing/walking limited to two hours, lifting and carrying occasionally, no restrictions on fingering and hand motions, occasional bending/stooping, and no unprotected heights or hazardous machinery.  A.R. 88.  Dr. Davis stated that she called Dr. Jennings on March 12, 2012, and that Dr. Jennings reported that Plaintiff could do sedentary work with a sit/stand option, although Dr. Jennings was unsure if Plaintiff could do full-time work.  A.R. 89. .

On March 14, 2012, Hartford informed Plaintiff that it had completed its appeal review and determined that Plaintiff was not disabled, because Plaintiff had the functionality to perform the occupation of Supervisor – Accounting Clerks, which meets the wage requirements.

## B. Reasonable Explanation in Light of Plan Provisions

The Sixth Circuit has described the arbitrary and capricious standard as follows:

> The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citation omitted).  The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was "rational." Id. Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious. Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000).  Yet the deferential standard of review does not mean courts should "rubber stamp[ ]" a plan administrator's decision – a court must review the quantity and quality of the medical evidence on each side. Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006).  A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence." Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir.1991).

Schwalm v. Guardian Life Ins. Co. of Am., 626 F.3d 299, 308 (6th Cir. 2010).

Because deferential arbitrary and capricious review applies to this case, the Court must uphold the denial of benefits decision if there is a reasonable explanation for the decision in light of the Plan's provisions.  Defendants argue that Hartford's decision was reasonably based on the independent medical examination by Dr. Lerchin and the independent file review by Dr. Davis, as well as Plaintiff's self-reported activities.   Def. Mot. at 17. The Court concludes that Defendants are correct, and that a reasonable explanation for Hartford's denial of Plaintiff's benefits exists – namely, that the evidence in the record indicates that Plaintiff had the functional capacity to perform sedentary work with various limitations.

A denial of benefits is upheld under arbitrary and capricious review if there is a rational basis for the decision.  See Morris v. Am. Elec. Power Long-Term Disability Plan, 399 F. App'x 978, 984 (6th Cir. 2010) ("Surely it is reasonable to require a plan administrator who determines that a participant meets the definition of 'disabled,' then reverses course and declares that same

participant 'not disabled' to have a <u>reason</u> for the change; to do otherwise would be the very definition of 'arbitrary and capricious.'").  In other words, Hartford must have "had a rational basis for concluding that [claimant] was <u>not disabled</u> at the time of the new decision."  <u>Id.</u> (emphasis in original).  The rational basis could be premised on "any number of factors [including] evidence of improvement . . . evidence better defining the participant's medical condition, or . . . newly-acquired skills that would permit the previously disabled participant to perform an occupation he had not been qualified for at the time of his disability."  <u>Id.</u>

The Court first turns to the Plan provisions regarding disability.  The disability requirements are the same in the 1998 SPD, the 2005 Plan, and the 2010 Policy. To meet the requirements for total disability within the first 24 months of disability, the participant's condition must prevent the participant from performing any occupation for which she is qualified, or may reasonably become qualified by education, training or experience.  A.R. 710; A.R. 725; A.R. 686.  After 24 months, the participant is considered disabled if her condition prevents her from performing any occupation for which she is qualified, or may reasonably become qualified by education, training or experience that would provide an income equal to or greater than 128% of the monthly disability benefit.  A.R. 710; A.R. 725; A.R. 686.

Benefits may be terminated if the participant does not meet the definition for total disability, does not receive regular medical care, or fails or refuses to provide required medical proof that the disability has continued uninterrupted.  A.R. 715; A.R. 728; A.R. 682. Furthermore, a participant must file a claim for Social Security disability benefits.  A.R. 717; A.R. 729; A.R. 684.

Under the Plan provisions at issue here, Plaintiff has the burden of demonstrating continuing disability.  See <u>Rose v. Hartford Fin. Serv. Group, Inc.</u>, 268 F. App'x 444, 452 (6th

34

Cir. 2008) ("[Plaintiff] carries the burden of presenting evidence showing that she was disabled from performing any occupation for which she was reasonably qualified by education, training, or experience."); see also Wages v. Sandler O'Neill & Partners, LP, 37 F. App'x 108, 112-113 (6th Cir. 2002) ("The policy also requires a claimant to provide Continental 'written proof of loss,' which leaves no room for doubt that the plaintiff bore the burden of proving that she was 'unable to perform the substantial and material duties' of her job.").   In this case, the Plan requires Plaintiff to continue to provide proof of loss; therefore, the burden is on Plaintiff to demonstrate that she is incapable of performing "any work or occupation for which [she is] or may become, reasonably well qualified to perform by education, training, or experience which will provide an income equal to or greater than 128% of the LTD benefit."

Finally, evidence of a diagnosis is not enough to demonstrate disability, without evidence of functional limitations.   See Wages, 37 F. App'x at 113 (noting that a denial of benefits decision was not arbitrary and capricious where the claimant's physicians indicated that claimant was diagnosed with fibromyalgia, but the medical evidence indicated that the claimant was functionally capable of performing work); Rose, 268 F. App'x at 453 (holding that it was reasonable for the insurer to require objective evidence of the claimant's functional capacity, where the claimant was diagnosed with fibromyalgia and chronic fatigue syndrome).

In light of this law, the Court concludes that Hartford had a rational basis for terminating Plaintiff's benefits.   It is true that the medical record establishes that Plaintiff had underlying conditions of fibromyalgia and chronic fatigue syndrome, manifesting in symptoms of spinal pain that were supported by MRIs indicating degenerative disc disease.   However, Plaintiff had the burden of demonstrating, not just an underlying condition, but that the condition resulted in objectively supported functional limitations that prevented her from performing work within the

scope of the Plan.  Hartford's conclusion that Plaintiff was capable of doing sedentary work with certain limitations was rational and supported by medical opinions and Plaintiff's self-reported activities.

First, Dr. Lerchin, who performed a physical examination of Plaintiff, concluded that Plaintiff could perform sedentary work that involved sitting for 7 hours out of an 8-hour workday, with limitations on stretching, lifting, and reaching, but with no limitations on fingering/handling movements. Second, a medical report from Dr. Delewski indicates that Plaintiff's pain was substantially reduced by taking ibuprofen and using epidural steroid injections.  Third, a medical report from Dr. Prohow, Plaintiff's family doctor, states that Plaintiff's mood and concentration were normal, with no fatigue or malaise.  Fourth, Plaintiff's statements also indicate that she is able, with some difficulty, to manage her conditions, and her self-reported activities include driving, shopping, walking, and executing tasks related to her Power of Attorney designation.  Plaintiff emphasizes that she must be careful and take her time in performing routine tasks, but the Court concludes that Plaintiff's ability to perform these tasks, along with the medical opinions regarding her pain level and functional capacity, provide a rational basis for Hartford's conclusion that Plaintiff was no longer under total disability.

### C. Plaintiff's Arguments

Plaintiff presents several arguments to support the proposition that Hartford's termination of her benefits was arbitrary and capricious.  The Court addresses each of these arguments in turn.

### 1. No evidence of improvement

Plaintiff argues that Hartford terminated her benefits without any evidence of improvement, and that her conditions of fibromyalgia and chronic fatigue disorder did not

improve.  Pl. Mot. at 11-12.  Defendants argue that there is no requirement that a claimant's condition improve before a benefits termination will be upheld.  Def. Resp. at 8.

The Sixth Circuit has explained that a decision terminating benefits is not necessarily arbitrary and capricious solely because there was no evidence of improvement:

> Surely it is reasonable to require a plan administrator who determines that a participant meets the definition of "disabled," then reverses course and declares that same participant "not disabled" to have a reason for the change; to do otherwise would be the very definition of "arbitrary and capricious." It does not follow, however, either logically or from our decision in Kramer, that the explanation must be that the plan administrator has acquired new evidence demonstrating that the participant's medical condition has improved. While Morris contends that the legal issue "is not whether there is 'new evidence,' but whether the evidence—new or old—establishes that Morris's medical condition had improved," the ultimate question is whether the plan administrator had a rational basis for concluding that Morris was not disabled at the time of the new decision. Under the any-occupation standard at issue in this case, any number of factors could be germane to such a determination—including evidence of improvement, certainly, but also including evidence better defining the participant's medical condition, or even, given the plan's definition of "disabled," newly-acquired skills that would permit the previously disabled participant to perform an occupation he had not been qualified for at the time of his disability.

Morris, 399 F. App'x at 984.

Therefore, the critical issue is not whether there was evidence of an improvement in Plaintiff's condition, but whether there was evidence that provided a rational basis for the termination of benefits. As explained above, the Court concludes that Hartford did have a rational basis, based on evidence of Plaintiff's functional capacities in 2011, for the termination.

## 2.  Treating physicians

Plaintiff argues that the medical opinions of her treating physicians, Dr. Grenz and Dr. Jennings, that Plaintiff was totally and permanently disabled provide strong evidence of Plaintiff's disability.  Pl. Mot. at 14.   Plaintiff also argues that Dr. Davis's alleged phone conversation with Dr. Jennings, in which Dr. Jennings reportedly stated that Plaintiff could do

37

sedentary work, was unsupported and contradicted by Dr. Jennings's medical reports.  Id.
Defendant argues that an ERISA plan administrator is not bound by the medical opinions of
treating physicians.  Def. Mot. at 18.

The Supreme Court has held that there is no treating physician rule in ERISA.  Black &
Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003).  The Court explained:

> Plan administrators, of course, may not arbitrarily refuse to credit a claimant's
> reliable evidence, including the opinions of a treating physician. But, we hold,
> courts have no warrant to require administrators automatically to accord special
> weight to the opinions of a claimant's physician; nor may courts impose on plan
> administrators a discrete burden of explanation when they credit reliable evidence
> that conflicts with a treating physician's evaluation.

Id.  Furthermore, the Sixth Circuit has held that:

> Generally, when a plan administrator chooses to rely upon the medical opinion of
> one doctor over that of another in determining whether a claimant is entitled to
> ERISA benefits, the plan administrator's decision cannot be said to have been
> arbitrary and capricious because it would be possible to offer a reasoned
> explanation, based upon the evidence, for the plan administrator's decision.

McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003).

The Court concludes that this is not a situation where a plan administrator arbitrarily
refused to credit the medical opinion of a treating physician.  Instead, Hartford, noting that Dr.
Grenz had not treated Plaintiff since 2009, credited the medical opinions of the independent
medical examiner and the independent medical file reviewer.  Under Black & Decker and
McDonald, this is not arbitrary and capricious, because Hartford had the discretion to rely on the
opinion of one doctor over that of another.

Defendants also cite Dr. Jennings's reported telephone statement that Plaintiff could do
sedentary work in support of the termination of benefits.  However, the Court agrees with
Plaintiff that this alleged statement is suspicious and contradicts prior written reports submitted
by Dr. Jennings.  In Rabuck v. Hartford Life and Acc. Ins. Co., 522 F. Supp. 2d 844, 879-880

(W.D. Mich. 2007), the court considered a similar situation, where an independent medical examiner reported that a treating physician had told the examiner that the claimant's disabilities were primarily psychological.  The court noted that the same treating physician stated, in a written report, that the claimant required multiple physical restrictions.  The court stated that the "recitation . . . must be deemed manipulative and incredible.  Furthermore, the conflict of interest [the independent medical examiner] was operating under when he wrote down the . . . version of what [the treating physician] reportedly stated during the telephone conversation . . . is a factor to take into account in determining whether Hartford's decision denying plaintiff's appeal was arbitrary and capricious." Id. at 879.

        In the instant case, Dr. Jennings reportedly told Dr. Davis that Plaintiff could perform at least part-time sedentary work.  However, in 2011, Dr. Jennings specifically responded to Hartford's independent medical review; Dr. Jennings stated she disagreed with the conclusion in the independent medical review, and considered Plaintiff to be totally disabled.  Because the reported phone conversation is in direct contradiction to the various written reports by Dr. Jennings, the Court does not credit the reported phone conversation.  However, the Court concludes that any conflict of interest stemming from Dr. Davis's reporting of this conversation – although it is a factor in determining whether the denial of Plaintiff's claim was arbitrary and capricious – does not compel a conclusion that Hartford acted arbitrarily and capriciously.  Although the Court disregards this alleged phone call, Hartford had sufficient additional evidence of Plaintiff's functional capacity to provide a rational basis for the termination of benefits, as is discussed above.  Specifically, even if the Court disregards Dr. Davis's reports on credibility grounds, the reports of Dr. Lerchin, Dr. Delewsky, the indications that Plaintiff's

symptoms improved with treatment, and Plaintiff's self-reported activities provide a rational basis for the denial of benefits.

### 3. Social Security opinion

Plaintiff received a Social Security decision determining that she was disabled, and that she was entitled to Social Security benefits beginning April 1998. A.R. 570. "Disability" is defined under the Social Security regulations as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months." A.R. 528. The Social Security Administrative Law Judge (ALJ) concluded that Plaintiff lacked the residual functional capacity for full-time employment under competitive employment conditions. A.R. 533. In 2002, the Social Security Administration determined that Plaintiff's disability was continuing. A.R. 105.

Plaintiff signed a reimbursement agreement stating that her disability benefit under the Plan would be reduced by the Social Security disability benefit award. A.R. 486. Plaintiff's Social Security payments were subsequently deducted from the Plan benefit payments. A.R. 478.

In Hartford's denial letter terminating Plaintiff's benefits, the entire discussion of the Social Security decision is as follows:

> It is possible to qualify for SSD, but no longer continue to qualify for private long-term disability (LTD) benefits from The Hartford. The standards governing these public and private benefits are different in critical ways. In determining entitlement to SSD, the Social Security Administration (SSA) measures your condition against a unique set of federal criteria. By contrast, continued qualification for benefits under your private LTD policy depends in part on the consistent interpretation of the specific terms in that policy. Therefore, while The Hartford considers the SSA's disability determination as one piece of relevant evidence, the SSA's determination is not conclusive. The following will help to explain why The Hartford reached a different conclusion than the SSA regarding

40

disability benefits.

A.R. 13.

Plaintiff argues that Hartford's mere mention of the Social Security decision awarding benefits to Plaintiff is not enough to fulfill Hartford's burden of reconciling its decision with the Social Security decision.  Pl. Mot. at 15-16.  Defendants respond that Hartford is not bound by the Social Security decision, and that Hartford sufficiently explained the difference in the definitions of disability between the Social Security Administration and the Plan.  Def. Mot. at19-20; Def. Resp. at 11.

"[T]here is no technical requirement to explicitly distinguish a favorable Social Security determination in every case."  DeLisle v. Sun Life Assur. Co. of Canada, 558 F.3d 440, 446 (6th Cir. 2009). However, a plan administrator's failure to address the Social Security Administration's finding "is yet another factor that can render the denial of further long-term disability benefits arbitrary and capricious."  Glenn v. MetLife, 461 F.3d 660, 669 (6th Cir. 2006).  In particular, "if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious."  Bennett v. Kemper Nat. Serv., Inc., 514 F.3d 547, 554 (6th Cir. 2008).  However, even when "the insurer requires the insured to apply for social security disability benefits," the Social Security decision is not dispositive, but is "one factor for the court to consider in determining whether an insurer's contrary decision was arbitrary and capricious."  Noland v. Prudential Ins. Co. of Am., 187 F. App'x 447, 454 (6th Cir. 2006).

The Court concludes that Hartford did not sufficiently distinguish the Social Security decision, but that this is not enough to overturn Hartford's decision as arbitrary and capricious. The only discussion of the Social Security decision in the denial letter is what appears to be a form statement that the Social Security decision is not conclusive and the Social Security's definition of disability is different from the definition of disability in the Plan. However, the denial letter did not explain how this difference reconciled the Social Security decision with Hartford's termination of benefits. Furthermore, the Plan required Plaintiff to apply for Social Security benefits, and the Social Security benefits were then deducted from her ERISA benefits. Therefore, this factor weighs toward a finding that Hartford's decision was arbitrary and capricious.

However, although the factor weighs toward a finding that the termination was arbitrary and capricious, this factor is not dispositive. Overall, this factor is not enough to disturb the Court's prior conclusion that Hartford had a rational basis for the denial of benefits. In particular, the Social Security Administration last analyzed Plaintiff's claim in 2002, and Hartford discussed much more recent evidence – from 2010 and 2011 – indicating that Plaintiff had the functional capacity to perform some sedentary work. The Sixth Circuit has held,

> [A] failure to take into account a Social Security disablity award is to be <u>weighed</u> in favor of a finding that the decision was arbitrary and capricious, not that such a decision is arbitrary and capricious per se. . . . In this case, however, the dissonance between the plan's encouragement of [claimant's] Social Security claim and its subsequent denial of benefits is muted, because more than twelve years had passed between the time [claimant] was determined to be disabled by the Social Security Administration and the time [his ERISA benefits were terminated].

<u>Morris</u>, 399 F. App'x at 986 (emphasis in original). Therefore, the favorable Social Security determination is not enough, in and of itself, to conclude that Hartford's termination of Plaintiff's benefits was arbitrary and capricious.

42

### 4.  Employability analysis

Plaintiff argues that Hartford's employability analysis was faulty, for several reasons.  Pl. Mot. at 18-19.   Plaintiff contends that analysis ignored Plaintiff's symptoms of pain, sleep disturbance, and fatigue, and that the wage calculation is flawed because it does not take into account inflation.  Id. at 18.  Plaintiff contends that the national average salary for a supervisor of accounting clerks is $3,453.25 monthly, which falls below Plaintiff's wage requirement.  Id. (citing the Career Builder website).  Plaintiff also argues that she does not have the qualifications for a Supervisor – Accounting Clerks, which include a bachelor's degree in accounting or finance, knowledge of accounting procedures, and proficiency in accounting software packages and database applications.  Id. at 19 (citing an ehow.com website describing accounting clerk supervisor positions).  Plaintiff contends she also does not have the mental focus for a Supervisor – Accounting Clerk position.  Id. at 19-20.

Defendants respond that the employability analysis is valid.   Def. Resp. at 12. Defendants argue that the Policy provides a wage calculation based on the claimant's pre-disability earnings and that based on the clear terms of the Policy, Hartford's wage calculation was correct.  Id.  Defendants argue that the Department of Labor establishes that the monthly earnings of an accounts clerk supervisor is $3,908.67.  Id. at 13.  Finally, Defendants argue that the position of Supervisor—Accounting Clerk has excellent transferability to Plaintiff's prior work.  Id.

The Court addresses each of Plaintiff's arguments in turn.  First, the argument that the employability analysis ignores Plaintiff's symptoms of pain and mental fatigue lacks merit; the employability analysis used a functional capacity determined by Dr. Lerchin on the basis of Plaintiff's medical record and an examination of Plaintiff, including Plaintiff's discussions of her

"difficulty focusing" and "fatigue."  A.R. 175; A.R. 131.  Second, as Defendant contends, the Plan provides for a wage calculation based on the benefits earned from a claimant's average monthly pay during the 12 months preceding disability.  A.R. 712; A.R. 687.  Therefore, the Plan does not contemplate taking into account the effects of inflation, so Plaintiff's argument regarding inflation lacks merit as well.  Third, Defendant's reliance on the occupational wages as stated by the Department of Labor is not arbitrary and capricious.

Finally, the administrative record indicates that Plaintiff would be qualified for a Supervisor – Accounting Clerks position.  Plaintiff has a bachelor's degree in business administration, and she has worked as a debit balance specialist and an accounts payable supervisor at Target.  Therefore, Plaintiff's argument that she has no experience with accounting systems seems to be contradicted by the record.  Additionally, it is rational that Plaintiff could become "reasonably well qualified" to perform those accounting tasks that she is not already proficient in, given her extensive background.  Furthermore, Hartford could reasonably conclude that Plaintiff had sufficient mental focus for a supervisor of accounting clerks position, especially because Plaintiff's family doctor, Dr. Prohow, indicated that Plaintiff had normal attention, concentration, and energy level.  Although Plaintiff has been out of the work force for many years, overall the Court concludes that Hartford's determination that she was or could become reasonably well qualified for a position of supervisor of accounts clerks was not arbitrary and capricious.

### 5.  Conflict of Interest

Plaintiff argues that Hartford was operating under an inherent conflict of interest, as both payor of benefits and the party determining benefits eligibility.  Pl. Br. on Mot. for J. at 13-14. Defendants contend that the structural conflict of interest under which Hartford was operating is

44

just one factor to take into account in applying arbitrary and capricious review.  Def. Resp. at 2-3.  Defendants contend that the evidence shows Hartford's review was fair and thorough and not financially motivated.  Id. at 3.

Because Hartford both determines eligibility for benefits under an ERISA plan and also pays those benefits, an inherent conflict of interest exists.  See Schwalm, 626 F.3d at 311.  A court is to consider a conflict of interest as one factor among several in evaluating a plan administrator's decision to deny benefits.  Metro Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008).  However, "this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious."  Hunter v. Life Ins. of N. Am., 437 F. App'x 372, 376 (6th Cir. 2011.  A court should look to see "if there is evidence that the conflict in any way influenced the plan administrator's decision."  Id. (citing Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 606 n.2 (6th Cir. 2004).

Although it is true that this is a case in which "the potential for self-interested decision making is evident," Calvert v. Firstar Finance, Inc., 409 F.3d 286, 292 (6th Cir. 2004) (citations omitted), the Sixth Circuit has counseled that a "conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious."  Hunter, 437 F. App'x at 376.

The Court has carefully reviewed the record, and concludes that Plaintiff has not pointed to any evidence that a conflict of interest affected the benefits decision.  As the Court discussed above, Dr. Davis's reporting of Dr. Jennings statement that Plaintiff was not disabled is disregarded, but the lack of credibility in Dr. Davis's statement is not sufficient to warrant

45

overturning the denial of benefits as arbitrary and capricious.  Nor has Plaintiff shown evidence that Hartford's reliance on the opinions of independent medical examiners over the treating physicians is driven by a conflict of interest to the point where it is arbitrary and capricious.  See, e.g., McDonald, 347 F.3d at 169 (holding that it is generally not arbitrary and capricious for a plan administrator to rely on the medical opinion of one doctor over another, because "it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.").  Furthermore, Hartford, in crediting the opinion of Dr. Lerchin, who examined Plaintiff in 2011, noted that one of Plaintiff's treating physicians, Dr. Grenz, had not seen Plaintiff in several years.  A.R. 12.

Overall, Plaintiff has not pointed to evidence in the record regarding conflict of interest that would support overturning Hartford's decision as arbitrary and capricious.

## V.       CONCLUSION

For the above reasons, the Court concludes that Hartford's termination of Plaintiff's benefits was not arbitrary and capricious.  Under the arbitrary and capricious standard, there is sufficient record evidence to provide a rational basis for Hartford's termination of the benefits. Because there is a reasonable explanation for the denial of benefits, the Court is bound to uphold Hartford's decision.  Therefore, the Court grants Defendants' motion for judgment (Dkt. 21) and denies Plaintiff's motion for judgment (Dkt. 22).[10]

---

[10] Defendants also filed a motion for leave to file a reply brief to Plaintiff's supplemental brief (Dkt. 41), seeking to distinguish case law relied upon by Plaintiff.  Plaintiff filed a response (Dkt. 42), arguing that the relevant authorities have already been raised.  Because this Opinion discusses, and distinguishes, the cases on which Defendants rely in their proposed brief, the Court grants the motion to allow a full analysis of the relevant authorities.

SO ORDERED.

Dated:  September 25, 2013                    s/Mark A. Goldsmith
        Flint, Michigan                       MARK A. GOLDSMITH
                                              United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 25, 2013.

                                              s/Deborah J. Goltz
                                              DEBORAH J. GOLTZ
                                              Case Manager